J-A28020-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| EDWARD R. KORNBERGER, ADMINISTRATOR OF THE ESTATE OF DONNA ZAPPASODI | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : : : | |
| v. | : : : | |
| | : | No. 3407 EDA 2016 |
| | : | |
| LEHIGH VALLEY HEALTH NETWORK, INC., LEHIGH VALLEY HOSPITAL, INC., SURGICAL SPECIALISTS OF THE LEHIGH VALLEY, MICHAEL BADELLINO, M.D., DALE DANLEBEN, M.D., JOHN J. HONG, M.D., DAN TAYLOR, CRNP, LAMA2DISSOLVING CO., INC., F/K/A LEHIGH AREA MEDICAL ASSOCIATES, P.C., LEHIGH VALLEY PHYSICIANS GROUP, AFFILIATED WITH THE LEHIGH VALLEY HEALTH NETWORK | : : : : : : : : : : : : : : | |

Appeal from the Judgment Entered December 13, 2016
In the Court of Common Pleas of Lehigh County
Civil Division at No(s):  2014-C-1508

BEFORE:  GANTMAN, P.J., PANELLA, J., and DUBOW, J.

MEMORANDUM BY PANELLA, J.                    **FILED JUNE 11, 2018**

Edward Kornberger, as administrator for the estate of Donna Zappasodi ("the Estate"), appeals from the judgment entered after a jury found that Lehigh Valley Hospital ("LVH") and other associated defendants had not committed medical malpractice. The Estate believes a new trial is warranted based upon four separate challenges to the trial court's evidentiary rulings. We affirm.

Our standard of review is as follows: We reverse an order to deny a new trial only when the trial court abused its discretion. **See Paliometros v. Loyola**, 932 A.2d 128, 132 (Pa. Super. 2007). We review the decision to determine whether the court erred. **See id**. If so, we must also determine whether the error requires a new trial. **See id**. If the appellant asserts the court committed an error of law, we will scrutinize for legal error. **See id**. We review the court's determination on prejudice for an abuse of discretion. **See id**. "An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will." **Id**. (citations and quotation marks omitted).

Except where noted, the facts of this case are largely uncontested. Zappasodi, then 60 years old, was treated at LVH for injuries arising from a fall on May 7, 2012. Her medical history, in relevant part, included diverticulitis and a reversed colostomy. She was discharged after receiving treatment.

The next day, she suffered another fall, and was again transported to LVH, where she was diagnosed with significantly more serious injuries, including pelvic and sacral fractures. (The sacrum is a large, triangular bone at the base of the spine.) She was admitted to the hospital and placed in the intensive care unit before being placed in the trauma transitional unit.

By May 10, hospital staff observed indications that Zappasodi was suffering from either a bowel obstruction or an ileus. An ileus occurs when

"the functioning of the bowel, particularly the small bowel, decreases to the point that the normal squeezing motion that pushes fluid and food forward [has] stopped." N.T., Jury Trial, 4/26/16, at 201. Furthermore, tests indicated possible pneumonia in Zappasodi's right lung.

A nasogastric ("NG") tube was inserted down Zappasodi's esophagus to evacuate the contents of her stomach and small bowel. Over 800 mL of fluid was removed from her by the NG tube.

The next morning, the 12th, hospital staff observed indications that the ileus had resolved. As a result, the NG tube was clamped, and Zappasodi was given clear fluids by mouth. By that afternoon, staff had observed symptoms indicating the ileus had not resolved. In response, a new set of scans were performed.

The scans indicated no significant difference from the May 10th scans; Zappasodi's ileus had not resolved, and her right lung still showed symptoms of possible pneumonia. Before 9 p.m., a nurse observed Zappasodi's eyes roll back into her head. Despite prolonged resuscitative efforts, Zappasodi passed away at approximately 11 p.m.

At trial, the Estate argued that the defendants had breached their duty of care on the 12th. Specifically, the Estate alleged that

> [a] simple set of interventions, including physical examination, discontinuation of oral feeding, assessment of the position and patency of the NG tube, and re-institution of intermittent suctioning through this tube, would have prevented these events. The interventions, collectively, would have taken fewer than ten minutes of medical attention by her providers, and, yet, despite

progressive symptoms and concerns expressed not only by family members but other members of her care team, she was never re-assessed by the clinicians primarily charged with her care over the course of May 12, 2012.

Expert Report of Peter F. Clardy, M.D., 12/4/15, at 9.

In contrast, the defendants asserted that Zappasodi's death was not caused by aspiration. Rather, the defendants presented an expert opinion that Zappasodi died due to complications from the injuries sustained in her fall, combined with pre-existing cardio-vascular disease. Thus, under defendants' theory, any decisions regarding the treatment of Zappasodi's ileus on May 12th did not contribute to her death.

The jury found no negligence on the part of the defendants. The trial court denied the Estate's post-trial motions, and this timely appeal followed.

The Estate first contends the trial court erred in precluding the expert testimony of Marianne Hamel, M.D., Ph.D., who had performed the autopsy of Zappasodi. When considering the admission of expert evidence, our standard of review is very narrow:

> The admission or exclusion of evidence, including the admission of testimony from an expert witness, is within the sound discretion of the trial court. … [W]e may only reverse upon a showing that the trial court clearly abused its discretion or committed an error of law. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

***Turney Media Fuel, Inc., v. Toll Bros., Inc***., 725 A.2d 836, 839 (Pa. Super. 1999) (internal citations omitted). ***See also*** Pa.R.E. 702 *Comment*.

The trial court excluded Dr. Hamel's expert testimony due to the Estate's failure to identify her as an expert or submit her expert report before the close of discovery. The Estate does not dispute that it submitted Dr. Hamel's report after the deadline had passed or that it had failed to identify Dr. Hamel as an expert it intended to call at trial. The Estate asserts it did not intend to call Dr. Hamel until it received the defendants' expert reports that asserted the ileus did not cause Zappasodi's death. The Estate argues the trial court's preclusion of Dr. Hamel's expert testimony was an improper sanction under the circumstances.

Pursuant to the rules of discovery, the proponent of an expert witness is required to identify the expert in response to interrogatories and state the substance of the expert's facts and opinions in a signed report or answer. *See* Pa.R.C.P. 4003.5(a)(1). The failure to comply with Rule 4003.5(a)(1) generally results in the preclusion of the expert's testimony. *See* Pa.R.C.P. 4003.5(b). "However, if the failure to disclose the identity of the witness is the result of extenuating circumstances beyond the control of the defaulting party, the court may grant a continuance or other appropriate relief." *Id*. Thus, exclusion of testimony is not a mandatory remedy. *See Corrado v. Thomas Jefferson University Hospital*, 790 A.2d 1022, 1032 (Pa. Super. 2001).

"Rather, when a discovery violation occurs as a result of a failure to identify an expert witness, the presiding court must balance the facts and

circumstances of each case to determine prejudice to each party." *Id*. (internal quotation marks and citations omitted). Circumstances to consider include: (1) the ability of the defaulting party to have discovered the witness earlier; (2) the reasonableness of the excuse offered for the default; (3) whether the defaulting party's conduct was willful; (4) whether there was an intent to mislead; (5) the prejudice suffered by the defaulting party if the testimony is excluded; (6) the prejudice to the opposing party caused by the default; (7) the ability to cure any prejudice to the opposing party; (8) the impact of the default on the administration of the court's docket; and (9) whether the defaulting party acted in bad faith. *See Curran v. Stradley, Ronon, Stevens & Young*, 521 A.2d 451, 457 (Pa. Super. 1987). *See also Corrado*, 790 A.2d at 1032.

The Estate contends the trial court failed to consider the prejudice exclusion would cause to the Estate's case, and that it presumed prejudice to the defendants. However, our review reveals the trial court considered all of these factors and weighed them thoughtfully. *See* Trial Court Opinion, 9/30/16, at 10-14 (finding an absence of bad faith, but concluding the Estate knew of Dr. Hamel since the case began, and had failed to identify her as an expert witness due to "gamesmanship"). Furthermore, we find the court's reasoning does not constitute an abuse of discretion. Thus, the Estate's first argument on appeal merits no relief.

Next, the Estate argues the trial court erred in precluding its use of Nurse Dorothy Diehl's deposition testimony to impeach her.[1] The Estate questioned Nurse Diehl at her deposition regarding her actions during the evening of May 12, 2012. She acknowledged she became aware of gastric distention possibly indicative of a small bowel obstruction. The Estate sought to determine how she reacted to this knowledge:

> Q.   [] What did you conclude on seeing these x-ray results?
>
> A.   I called the trauma resident.
>
> Q.   And were you concerned about the persistence of the small bowel obstruction and distention as compared to the 10th?
>
> A.   I just only called her on the x-ray results.
>
> Q.   What about the x-ray results were concerning to you?
>
> A.   What it says.
>
> Q.   Explain to me what caused you concern.
>
> A.   That she had gastric distention and small bowel obstruction.

N.T., Deposition, 6/24/15, at 203-204.

In contrast, when the Estate asked Diehl at trial why she called the trauma resident, she testified, "I was tying up loose ends." N.T., Jury Trial,

---

[1] There are indications in the record that Nurse Diehl's full name is Dorothy Diehl Scherer. However, all parties on appeal and the trial court refer to her as Nurse Diehl. For the sake of consistency, we will also follow this convention.

5/5/16, at 147. Counsel for the Estate asked if she remembered when she was "asked that question at deposition[.]" *Id*. The trial court sustained defense counsel's unspecified objection to this question. *See id*.

The Estate argues it was entitled to cross-examine Diehl using her deposition testimony. The trial court—without any citation or discussion of authority on the issue—states that it "did not allow … questions which improperly used the deposition testimony for impeachment." Trial Court Opinion, 9/30/16, at 27.

"Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of a deponent as a witness[.]" Pa.R.C.P. 4020(a)(1). In the absence of a specific objection or any specific discussion underlying the trial court's decision to preclude the use of the deposition testimony, we are unable to divine what about the use of the deposition was improper. This ruling was an abuse of the trial court's discretion.

However, in order to gain relief on appeal, the Estate must also establish that it suffered prejudice from this ruling. *See Turney Media Fuel, Inc.*, 725 A.2d at 839. Unless an error of law controls the outcome of a case, we will not reverse an order denying a new trial. *See Lockley v. CSX Transp. Inc.*, 5 A.3d 383, 388 (Pa. Super. 2010). "[A] litigant is entitled only to a fair trial and not a perfect trial." *Id*. at 392 (citation omitted).

Here, we have no difficulty concluding this issue did not control the outcome of the case; the trial court's error was harmless. The Estate presented the expert testimony of Dr. Clardy, a specialist in critical care medicine, and a chair of medical education at Mount Auburn Hospital in Cambridge, Massachusetts. Dr. Clardy opined on the standard of care exercised by the defendants in this case. Nurse Diehl's impressions, as a treating nurse, would have been highly unlikely to sway a jury that rejected Dr. Clardy's opinion. Since the Estate cannot establish prejudice, its second issue on appeal merits no relief.

In its third issue, the Estate argues the trial court erred by allowing a defense expert to testify beyond the scope of his expert report. Defendants presented the expert testimony of Jeffrey S. Young, M.D., M.B.A., on the issue of standard of care.

In his initial pre-trial expert report, Dr. Young opined the "care provided by the trauma team met the standard of care." Expert Report of Jeffrey Young, 1/26/16, at 3. In a subsequent report, he opined "the film obtained on the afternoon/early evening of the 12th did not appear significantly different than the previous film, and had no indications for immediate intervention." Expert Report of Jeffrey Young, 4/11/16. He concluded "that Dr. Badellino, Dangleben and Hong, along with CRNP Taylor all complied with the standard of care in their treatment of Donna Zappasodi." *Id*.

Our Rules of Civil Procedure require an expert witness's testimony be limited to those topics that are contained within the fair scope of his expert report. **See** Pa.R.C.P. 4003.5(c).

> [I]n deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word "fair." The question to be answered is whether, under the circumstances of the case, the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response.

**Bainhauer v. Lehigh Valley Hospital**, 834 A.2d 1146, 1150-1151 (Pa. Super. 2003) (citations and emphasis omitted). Rule 4003.5 is intended to "prevent incomplete or 'fudging' of reports which would fail to reveal fully the facts and opinions of the expert or his grounds therefore[.]" Pa.R.C.P. 4003.5 *Comment*.

The Estate's arguments center on two portions of Dr. Young's testimony at trial. First, defense counsel asked Dr. Young to interpret a May 8, 2012 CT scan of Zappasodi's pelvis. The Estate objected, claiming this testimony was beyond the scope of Dr. Young's expert report. We disagree. Dr. Young's April 11th report indicates he reviewed Zappasodi's scans from this incident. And he opined that the May 12th scan did not reveal any significant differences from prior scans.

The Estate highlights his testimony that the May 8th scans contained ambiguous and "confusing" clinical presentations. This testimony is within the fair scope of Dr. Young's April 11th report. Dr. Young opined in his report that

the May 12th scan of Zappasodi "did not appear significantly different than the previous film." Thus, the Estate was on notice that Dr. Young would address the results of previous scans. This argument merits no relief.

The second sub-issue concerns Dr. Young's testimony that Kelly McGuire, D.O.'s reading of the May 12th scans did not violate the standard of care. The Estate contends this was outside the fair scope of Dr. Young's expert reports, as he never explicitly mentioned Dr. McGuire despite naming several other doctors. We agree with the trial court's conclusion that Dr. Young's use of the term "trauma team" should have alerted the Estate to Dr. Young's intentions. This claim merits no relief.

Lastly, the Estate argues the court erred in admitting evidence of habit.

Evidence of a person's habit … may be admitted to prove that on a particular occasion the person … acted in accordance with the habit. Habit connotes one's conduct in a precise factual context, and frequently involves mundane matters …. To establish a habit or custom, a party must prove behavior approaching fixed regularity. [W]hether evidence of such usage or habit is admissible to show what occurred in a specific instance depends on the invariable regularity of the usage or habit. To be admissible, the usage must have sufficient regularity to make it probable that it would be carried out in every instance or in most instances.

*Sutch v. Roxborough Memorial Hospital*, 151 A.3d 241, 251-252 (Pa. Super. 2016) (internal citations, parenthesis, and quotation marks omitted).

The Estate takes issue with the testimony of registered respiratory therapist Matthew Reis. Reis's videotaped testimony was played to the jury. The Estate focuses on Reis's interpretation of his clinical note from the

resuscitation of Zappasodi in the evening of May 12th. The note indicates that Zappasodi was "status post code on floor with positive aspiration[.]" N.T., Deposition, 2/9/16, at 48. Reis testified this "means that they aspirated at some point." *Id*., at 49.

He then stated, "[s]o in this instance how I wrote it, I would take this as they coded and then aspirated during the code." *Id*., at 50. The Estate did not object to this testimony.

The Estate did object to this next question: "The way you wrote it you think it meant that she – you were told she had aspirated and then – that she coded and then aspirated?" *Id*. However, this objection was based upon the leading nature of the question, not that it called for speculation. *See id*.

Then defense counsel asked: "Mr. Reis, if you had been told that the patient had coded as a result of aspiration, what would you have written?" *Id*., at 51. The Estate objected, asserting that the question called for speculation. *Id*. Reis answered, "I would write code due to aspiration or respiratory arrest." *Id*., at 52.

When the video was played at trial, the Estate requested Reis's answer be stricken as improper evidence of habit. We agree with the trial court that the foundation for this evidence of habit was laid by the Estate's earlier questioning of Reis:

> Q.   … Do you agree in those circumstances it's very important to chart accurately information that you obtain?
>
> A.   Yes.

> Q. And will you agree with me that you had *a habit of charting carefully and accurately*?
>
> A. Yes.
>
> …
>
> Q. And do you agree that you expect that other caregivers will rely on your charting to determine care needs and to determine outcomes?
>
> A. Yes.

***Id.***, at 28 (emphasis supplied). Thus, the trial court did not abuse its discretion in admitting Reis's answer as evidence of habit. The Estate's final issue on appeal merits no relief.

As we conclude none of the Estate's issues on appeal merit relief, we affirm the judgment.

Judgment affirmed.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/11/18